UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAE DEAN STRAWN,<br><br>Plaintiff,<br><br>v.<br><br>BRUCE SOKOLOFF, J. ANAYA, and CITY OF PORTERVILLE,<br><br>Defendants. | No. 1:22-cv-01245-KES-EPG<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Docs. 45, 46 |

On January 18, 2022, plaintiff Rae Dean Strawn was arrested by defendants Lieutenant Bruce Sokoloff and Detective Julia Anaya of the Porterville Police Department for improperly wearing a face mask while attending a Porterville City Council meeting. Doc. 50 ("Pl.'s Stmt. Mat. Facts") ¶¶ 8, 25, 29. She contends that Sokoloff and Anaya arrested her without lawful authority and used excessive force during the arrest. Doc. 26 ("FAC") ¶¶ 22–47. Defendants move for summary judgment on all claims. Doc. 46 ("MSJ"). For the reasons set forth below, the Court grants the motion.

**I.   Background**

Following the outbreak of COVID-19, the City of Porterville ("City") enacted Ordinance No. 1874 ("Ordinance") which required individuals to comply with the California Department of Public Health's "Guidance for the Use of Face Coverings" ("Guidance"). Doc. 49 ("Sullivan

Decl."), Ex. 1 ("Ordinance No. 1874") at 4–5. Among other requirements addressing risks related to COVID-19, the Guidance required that individuals, except those specifically exempted, wear a face mask "that covers the nose and mouth" in public spaces. *Id.* at 7, 9. The Ordinance provided that "[city] staff [are] authorized to engage in code enforcement efforts to remedy violations of the [Guidance, and] violations of these requirements are punishable as permitted by State law." *Id.* at 5.

On January 18, 2022, plaintiff Rae Dean Strawn, who was seventy-six years old at the time, attended a Porterville City Council meeting wearing a sweatshirt that read "Unmask Tulare County," the name of a local group that opposed face mask requirements for children at school. Pl.'s Stmt. Mat. Facts ¶¶ 9–10; Doc. 45-2 ("Scott Decl."), Ex. 7 ("Video") at 03:28. Prior to the start of the city council meeting, Strawn was not wearing a face mask, and Lieutenant Bruce Sokoloff ordered her to put one on or leave the meeting. Pl.'s Stmt. Mat. Facts ¶¶ 12–16. Strawn retrieved masks for herself and another person from a table in the city council chambers and they put them on. *Id.* There were seven people in the audience, and three of them, including Strawn, were speaking about face masks. *Id.* ¶¶ 12–13. During their conversation, Sokoloff told Strawn that she needed to wear the mask "properly."[1] *Id.* ¶¶ 17–19. Strawn contends that the mask was too big and would not stay over her nose, and she did not understand that "properly" meant "cover the nose." *Id.*

Sokoloff then stated, "I'm going to ask you to leave. If not, you're going to leave in handcuffs." *Id.* ¶ 22; Video at 0:03. Strawn, whose mask still did not cover her nose, responded, "I have a right to be here," and Sokoloff then ordered her to stand up and told her that she was under arrest. *Id.* ¶ 23; Video at 0:08. Although Sokoloff did not answer Strawn when she asked what law she had violated, Video at 0:11–0:20, he asserts that she was arrested for violating the Ordinance and California Penal Code § 148, which makes it a crime to "willfully resist[], delay[], or obstruct[] any public officer . . . in the discharge [of] any duty." *Id.* ¶¶ 8, 29; MSJ at 9.

---

[1] Strawn disputes this fact. *See* Pl.'s Stmt. Mat. Facts ¶ 17. However, the video reveals that he told her she needed to wear the mask properly at least once. *See* Video at 0:01. Defendants contend that Sokoloff told her to pull the mask up over her nose twice and told her to wear the mask "properly." Pl.'s Stmt. Mat. Facts ¶¶ 17, 18.

2

Detective Julia Anaya and Sokoloff handcuffed Strawn and escorted her outside. *Id.* ¶¶ 25–30; Video at 0:10–01:43. Greg Meister, another attendee, recorded the arrest on his phone and followed them outside. *Id.* ¶ 27.

Anaya directed Strawn to the parking lot and, as they arrived at the spot where they would wait for a police cruiser to take her to the station, Strawn informed Anaya that she had a "bad leg" and asked to slow down, so Anaya stopped. *Id.* ¶ 31; Video at 01:59–02:04. As they waited, Strawn complained that the handcuffs were too tight and hurt her wrists. *Id.* ¶ 32. Anaya checked them by placing a finger between the cuff and Strawn's wrist, saw that there was adequate room, and told Strawn they were fine. *Id.* ¶¶ 32, 64; Video at 02:14–02:25. Strawn abruptly responded, "You're full of shit," but did not complain of the handcuffs being too tight again. *Id.* ¶ 33; Video at 02:14–07:34.

The police cruiser arrived several minutes later, and Anaya directed Strawn into the backseat. *Id.* ¶ 40. Strawn had trouble getting into the backseat because a prior knee surgery inhibited her ability to bend her left leg. *Id.*; Video at 07:34–08:05. Strawn put her right leg in, sat down, and Anaya then helped her lift her left leg into the vehicle. *Id.* She was then transported to the Porterville Police Station and released shortly thereafter. Opp'n at 2.

The arrest bruised both of Strawn's wrists. *Id.* ¶ 53. She did not seek medical treatment for this injury, and she does not contend that she was physically injured in any other respect. *Id.* ¶ 54.

Following the arrest, Mr. Meister filed a complaint concerning Strawn's arrest with the City. *Id.* ¶ 50. An officer interviewed him about the complaint and decided that his allegations were unfounded. *Id.* ¶¶ 51–52.

On September 28, 2022, Strawn filed her federal complaint in this action. On April 3, 2023, the Court dismissed certain claims in her initial complaint. Doc. 22. She filed a first amended complaint on April 21, 2023, asserting claims under 42 U.S.C. § 1983 for excessive force and *Monell* liability, as well as state law claims of assault, battery, false arrest, false imprisonment, intentional infliction of emotional distress, gross negligence, and willful and wanton misconduct. FAC ¶¶ 22–47. On September 30, 2024, defendants moved for summary

judgment.  Doc. 46 ("MSJ").  Strawn opposed the motion, Doc. 48 ("Opp'n"), and defendants filed a reply, Doc. 51 ("Reply").  The motion was taken under submission without a hearing.

## II.     Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*  The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1).  The Court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  However, the nonmoving party's version of the facts need not be credited if it is blatantly contradicted by video evidence. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).  The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If "the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984; *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("[T]he moving defendant bears the burden of proof on the issue of qualified immunity.").

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses and "establish that there is a genuine issue of material fact." *Matsushita*, 475 U.S. at 585.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citation omitted).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is

4

insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252.

In the endeavor to establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380. Nevertheless, "[t]he mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos*, 892 F.3d at 1028 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment. But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

### III.   Discussion and Analysis

Defendants move for summary judgment on each of Strawn's claims. MSJ at 7–15. This Order examines each claim in turn.

#### a. False Arrest/False Imprisonment

Strawn's claim for false arrest and false imprisonment is premised on two bases: First, she argues, the Ordinance was "not a law," and second, the officers did not have probable cause to arrest her. Pl.'s Stmt. Mat. Facts ¶ 7; *see* Opp'n at 4–7.

"Under California law, 'false arrest is not a different tort' but 'is merely one way of committing a false imprisonment.'" *Arpin v. Santa Clara Valley Transp. Auth.*, 261 F.3d 912, 919 (9th Cir. 2001) (quoting *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1379 (9th Cir. 1998)). False imprisonment is "the violation of the personal liberty of another without lawful

privilege." *Id.* at 920 (quoting *Asgari v. City of Los Angeles*, 15 Cal. Rptr. 2d 842, 850 (Cal. 1997)). However, a police officer may not be held liable "for false arrest or false imprisonment arising out of any arrest when . . . [t]he arrest was lawful, or the [] officer . . . had reasonable cause to believe the arrest was lawful." Cal. Penal Code § 847(b)(1) (West 2024).

Strawn first contends that the arrest was not lawful because "there is no California law that states a person is required to wear a facemask indoors . . . [or] that a person must wear a facemask covering the nose." *Id.* at 7. Strawn acknowledges the existence of the Ordinance but argues that because the Guidance it referred to was only – in her view – a recommendation, the Ordinance could not have made its terms criminally punishable. *Id.*

Strawn's argument is plainly without merit. The California Constitution provides that a "city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7. "An ordinance is a local law which is adopted with all the legal formality of a statute," and it "prescribes a permanent rule of conduct or of government." *Childhelp, Inc. v. City of Los Angeles*, 91 Cal. App. 5th 224, 238 (Cal. Ct. App. 2023) (citations omitted).

On its face, the Ordinance provided that "[i]ndividuals, while in the City of Porterville, are *required to comply* with [the Guidance]." Ordinance No. 1874 at 5 (emphasis added). Then, the Guidance, which is attached as an exhibit to the Ordinance, provides that "[p]eople in California *must wear* face coverings when they are . . . inside of . . . any indoor public space." *Id.* at 7 (emphasis added). The Guidance defines "face covering" as "a material that covers the nose and mouth." *Id.* at 9. Strawn was therefore in violation of the Ordinance's plain terms when she entered the City Council chambers without a mask and when she failed to wear it properly.

Moreover, contrary to Strawn's argument that the Guidance was only a recommendation, the specific terms of the Ordinance and the Guidance are mandatory. The Ordinance states that people within the city limits of Porterville are "required to comply" with the Guidance and authorizes its enforcement, *id.* at 5, and the Guidance states that it "*mandates* that face coverings be worn," *id.* at 7 (emphasis added). Plaintiff argues that the word "guidance" in the title implies that the Guidance's requirements are merely recommendations, but the consistent, repeated use of

6

mandatory language throughout the text clearly refutes her interpretation. *See id.* Strawn relies solely on the word "guidance" in the title and does not point to any non-mandatory or ambiguous language in the actual text of the Guidance. As courts have regularly noted when interpreting statutes and regulations, the title of a statute or regulation can assist in understanding the meaning of its provisions but cannot alter its otherwise clear language. *See, e.g.*, *Ratha v. Rubicon Resources*, 111 F.4th 946, 961 (9th Cir. 2024) (noting that "titles of acts are not part of the law" and are not afforded "dispositive weight"); *Dailey v. City of San Diego*, 223 Cal. App. 4th 237, 251 (Cal. Ct. App. 2013) ("[T]itle or chapter headings are unofficial and do not alter the explicit scope, meaning, or intent of a statute.").

The officers were authorized to enforce the Ordinance by arresting her. The Porterville Municipal Code provides that "any person violating any of the provisions . . . or mandatory requirements [of an ordinance] . . . is guilty of a misdemeanor." Porterville, Cal., City Code ch. 1 § 1-9(E)(1) (2024). The Ordinance itself also states that "[v]iolations of these requirements are punishable as permitted by State law." *Id.* at 5. Under California law, a "public officer . . . may arrest a person without a warrant whenever the officer or employee has reasonable cause to believe that the person . . . has committed a misdemeanor in the presence of the officer . . . that is a violation of [an] ordinance that the officer . . . has the duty to enforce." Cal. Penal Code § 836.5(a) (West 2024); *see People v. Bloom*, 185 Cal. App. 4th 1496, 1501 (Cal. Ct. App. 2010) ("A warrantless arrest by a [public officer] for a misdemeanor occurring in [his or her] presence is lawful."). Strawn's failure to comply with the Ordinance was therefore a misdemeanor for which she was subject to arrest.

Nor did Strawn's arrest pursuant to the Ordinance violate her Fourth Amendment rights, as she contends. *See* Opp'n at 3–6. In *Atwater v. City of Lago Vista*, the Supreme Court examined an arrest made by a police officer due to the arrestee's failure to wear a seatbelt. 532 U.S. 318, 323–25 (2001). A Texas law made it "a misdemeanor punishable by a fine not less than $25 or more than $50" to drive without a seatbelt. *Id.* at 323 (citing Tex. Transp. Code Ann. § 545.413(d) (West 1999)). The Court held that when "an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may,

7

without violating the Fourth Amendment, arrest the offender." *Id* at 354. Strawn's arrest was therefore not barred by the Fourth Amendment, so long as Sokoloff and Anaya had probable cause.

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). An officer has probable cause "when under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *Id*. (quotations omitted). This is true "regardless of the officer's subjective reasons for" making the arrest. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

Here, Strawn was wearing her mask below her nose in violation of the Ordinance, and despite having been previously warned to wear the mask properly, when Sokoloff and Anaya arrested her. Video at 0:00–0:25; Pl.'s Stmt. Mat. Facts ¶¶ 23, 24, 25. Strawn disputes that the mask was below her nose, but the video clearly shows otherwise. Video at 0:00–0:10. This factual dispute is not genuine because Strawn's version of this fact is "blatantly contradicted by the record, so that no reasonable jury could believe it, [and in such a case,] a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Therefore, considering that the mask was below her nose, Sokoloff had probable cause to arrest her because there was not only "a substantial chance of criminal activity," but rather, "an actual showing of such activity." *Gates*, 462 U.S. at 232.

The arrest was lawful, and defendants are entitled to summary judgment on Strawn's false arrest and false imprisonment claims. *See* California Penal Code § 847(b)(1) ("[No] cause of action shall arise against, any peace officer . . . acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest when . . . [t]he arrest was lawful, or the

8

peace officer . . . had reasonable cause to believe the arrest was lawful.").

### b. 42 U.S.C. § 1983 Claim for Excessive Force Against the Officers

Sokoloff and Anaya also seek summary judgment on Strawn's excessive force claim. MSJ at 7–8, 12–13. To succeed on a § 1983 claim, a plaintiff "must demonstrate that the action (1) occurred under color of state law, and (2) resulted in the deprivation of [a] constitutional or federal statutory right." *Rodriguez v. City of Modesto*, No. 1:10-cv-01370-LJO-MJS, 2015 WL 1565354, at *14 (E.D. Cal. April 8, 2015) (quoting *Leer v. Murphy,* 844 F.2d 628, 632–33 (9th Cir. 1988)). The parties agree that Sokoloff's and Anaya's actions occurred under color of state law.

Sokoloff and Anaya argue that they are entitled to qualified immunity on Strawn's Fourth Amendment claim for excessive force. MSJ at 7–8. Qualified immunity shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* An officer may be denied qualified immunity only if "(1) the [evidence], taken in the light most favorable to the party asserting injury, show[s] that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Calonge*, 104 F.4th at 44 (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

The Court first analyzes whether Sokoloff's and Anaya's use of force violated Strawn's constitutional rights. The "use of force to effect an arrest" is examined "in light of the Fourth Amendment's prohibitions on unreasonable searches and seizures," and it is "measured by the

standard of objective reasonableness." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). This standard requires courts to decide "whether the totality of the circumstances justified a particular" use of force. *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). "The reasonableness of the force used . . . is determined by 'carefully balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Deorle*, 272 F.3d at 1279 (quoting *Graham v. Connor*, 490 U.S. 386 (1989)). A substantial governmental interest justifies a "greater intrusion upon the Fourth Amendment rights of the person," while an insubstantial governmental interest could render "the application of even minimal force" unreasonable. *Nelson*, 685 F.3d at 878. "When balancing the degree of force used against the governmental interests, 'it is the *need* for force which is at the heart of the analysis.'" *Id.* (quoting *Headwaters Forest Def. v. Cnty. of Humboldt* ("*Humboldt II*"), 276 F.3d 1125, 1130 (9th Cir. 2002)).

      **i. Nature and Quality of the Intrusion**

Homing in first on the nature and quality of the intrusion, the force used in this case was minimal and was not more than needed to arrest Strawn. The officers' only use of force was placing Strawn in handcuffs, holding her by the elbow to direct her outside, and lifting her left leg to help her into the backseat of the police cruiser. Video at 0:11–8:05.

Analysis of an excessive force claim is a fact-specific inquiry and requires consideration of a non-exhaustive list of factors to determine whether the governmental interest supported the intrusion on the individual's Fourth Amendment interests. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013). However, aside from setting out the legal standard, Strawn points to no helpful authority and fails to explain how Sokoloff's and Anaya's use of force was excessive. *See* Opp'n at 12–13 (citing the standard for excessive force but not explaining how it applies). As far as can be gleaned from Strawn's moving papers, the only asserted basis for an excessive force claim is the officers' use of handcuffs, which she alleges were too tight and caused small bruises on both her wrists. *See* Pl.'s Stmt. Mat. Facts ¶¶ 53–54. The Court therefore evaluates whether the officers' use of handcuffs rose to the level of unconstitutionally

10

excessive force.

An examination of two Ninth Circuit cases involving similar types of force illustrates where on the spectrum the amount of force employed against Strawn lies. On the one hand, in *Felarca v. Birgeneau*, 891 F.3d 809, 816–19 (9th Cir. 2018), the Ninth Circuit, confronted with force used by officers to disperse a large protest, held that officers' use of batons to jab arrestees in the torso and one officer's overhand strike to an arrestee's hand constituted minimal force. In reaching this conclusion, the court noted that "[w]hile injuries are not a precondition to section 1983 liability, their absence can suggest a lesser degree of force." *Id.* at 817. Considering that only one arrestee alleged that he suffered any injury, a welt which did not require medical attention, the court concluded that, even though the "force used was of a type that is generally intrusive, the amount of force applied [] was minimal." *Id.* at 816–17.

On the other hand, in *Alexander v. Cnty. of Los Angeles*, 64 F.3d 1315, 1320, 1322–23 (9th Cir. 1995), the court explained that although "measures used to restrain individuals, such as . . . handcuffing them, are reasonable" when performed responsibly, under some circumstances the use of handcuffs might constitute an intermediate or significant level of force. There, the facts showed that officers slammed the arrestee against a car, kicked his legs apart, and handcuffed him for forty-five minutes to an hour. *Id.* at 1322–23. The officer admitted that when he grabbed the arrestee's "wrists [to] handcuff him . . . [he] felt that [the arrestee's] wrist was kind of mushy . . . around the wrist area and [the arrestee] simultaneously stated that he was a dialysis patient." *Id.* at 1323. The arrestee asked the officers to loosen the handcuffs "repeatedly" throughout his detention, but they refused to do so for forty-five minutes to an hour. *Id.* "Nine months after this incident, . . . [the arrestee's] right hand was still swollen in that it had a walnut-sized protrusion on the back of it below the wrist[,] also remained numb, and he was not able to make a fist with it." *Id.* Without defining precisely whether this use of force was intermediate or significant, the court concluded that it was excessive. *Id.*

This case is readily distinguishable from *Alexander*, and a comparison to *Felarca* demonstrates that the force used was minimal. Although Strawn was handcuffed for a comparable amount of time to the arrestee in *Alexander*, she did not "repeatedly" ask the officers

11

to loosen the handcuffs – she asked only once. Pl.'s Stmt. Mat. Facts ¶ 32; Video at 02:14–07:34. More importantly, when Strawn asked, Anaya checked the handcuffs and made sure they were not too tight. Pl.'s Stmt. Mat. Facts ¶ 33. While Strawn says that this fact is disputed, this does not create a genuine factual dispute which the Court must resolve in her favor because the video clearly shows that, after Strawn complained, Anaya checked the handcuffs by placing a finger between the cuff and her wrist, Video at 02:14–02:25, the technique encouraged by the State of California Commission on Police Officer Standards and Training's regulations, Pl.'s Stmt. Mat. Facts ¶ 64; Doc. 45-2 ("Norton Decl.") ¶ 11. When events such as these are captured on video, the Court need not view the facts in the light most favorable to the nonmoving party; it "should [] view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 381. As such, the uncontroverted evidence establishes that Strawn complained only once of the handcuffs being too tight, and that officers then checked to make sure that they were not too tight, unlike in *Alexander*.

This case is also distinguishable in that the arrestee in *Alexander* told police officers that he was ill and the officer could tell that the area around his wrist was "mushy," rendering it obvious that the handcuffs might hurt him more than the average person, especially if bound too tightly. *Alexander*, 64 F.3d at 1323. Here, however, Strawn did not and does not contend that she had any physical ailment which would make the use of handcuffs more likely to hurt her than the average person. Although she told the officers that she was seventy-six years old, Video at 03:28, this fact, standing alone, does not make the use of handcuffs rise to a greater level of force – and Strawn does not argue that it does.

The force used is more akin to that examined in *Felarca*, where an officer delivered an overhand strike to one plaintiff's hand which left a welt that did not require medical attention. *Felarca*, 891 F.3d at 816. Here, the use of handcuffs left bruises which did not require medical attention. Pl.'s Stmt. Mat. Facts ¶¶ 53–54. Arguably, the force used in *Felarca* was more substantial than the force used here, as the Ninth Circuit has counseled that "[p]hysical blows or cuts often constitute a more substantial application of force than categories of force that do not involve an impact to the body." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)

(quotations omitted).  In any event, the force used here was minimal.

### ii. Governmental Interest

The next consideration is the government's interest in this particular use of force.  The need for the government's use of force is determined by a number of factors, including "'(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others . . . (3) whether he [was] actively resisting arrest or attempting to evade arrest by flight,' and any other 'exigent circumstances [that] existed at the time of the arrest.'" *Deorle*, 272 F.3d at 1280 (quoting *Humboldt I*, 240 F.3d at 1189–99).  However, these factors are non-exhaustive and a court should consider the totality of the circumstances.  *See Gravelet-Blondin*, 728 F.3d at 1091.  It bears repeating that "'it is the *need* for force which is at the heart of the analysis.'" *Nelson*, 685 F.3d at 878 (quoting *Humboldt II*, 276 F.3d at 1130).

As to the "severity of the crime," the Ninth Circuit applies this factor in "two slightly different ways." *Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019).  First, the court has applied it with a felony-misdemeanor distinction, which counsels that when "all other things [are] equal," use of force is more reasonable "when applied against a felony suspect than when applied against a person suspected only of a misdemeanor." *Id.*  Second, the court has used it "as a proxy for the danger a suspect pose[d] at the time force is applied," even though "the danger a suspect [posed] is a separate *Graham* consideration." *Id.*

In this case, Strawn committed a non-violent misdemeanor and the officers therefore had only a minimal governmental interest in using force.  As defendants concede, "the Ordinance could be viewed similarly [to] the seat belt law in *Atwater* – a minor offense that does not ordinarily require handcuffs and transportation to jail."  MSJ at 10.  Nevertheless, the Ninth Circuit has held that even though misdemeanors like this are "minor infraction[s]," their commission still "justifies . . . a minimal use of force." *See Nelson*, 685 F.3d at 880; *see also Humboldt I*, 240 F.3d at 1189–99 (noting that "the commission of a misdemeanor offense is not to be taken lightly" (quotations omitted)).

///

///

The only remaining relevant factor is whether Strawn resisted.[2] The Ninth Circuit draws a distinction between passive and active resistance. *Bryan*, 630 F.3d at 830. Resistance is not "a binary state," but rather, "runs the gamut from the purely passive protestor who simply refuses to stand [at an officer's command], to the individual who physically assault[s] [an] officer." *Id.* "Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.*

Here, defendants contend that Sokoloff instructed Strawn to pull the mask up over her nose numerous times and she refused to do so. Pl.'s Stmt. Mat. Facts ¶¶ 17–24. While Strawn disputes this contention, her version of the facts can be accepted only to a limited extent given the video evidence of the encounter. *See Scott*, 550 U.S. at 380–81 ("At the summary judgment stage, . . . [courts] should not [rely] on visible fiction; [they should view] the facts in the light depicted by the videotape."). The video shows, in the first ten seconds, Sokoloff ordering Strawn to wear her mask properly, while the mask is below Strawn's nose. Video at 00:02. When Strawn does not adjust the mask to cover her face properly as directed, Sokoloff states, "I'm going to ask you to leave. If not, you're going to leave in handcuffs." Video at 0:06. Strawn then turns her back to Sokoloff and does not comply with his command. Video at 0:07. At that point, Sokoloff and Anaya arrest Strawn. Video at 0:11–0:25.

Strawn's conduct constituted only passive resistance. The Ninth Circuit has held on numerous occasions that "a failure to . . . immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson*, 685 F.3d at 881. In *Humboldt II*, for example, the court concluded that protestors who used "black bear" devices to lock themselves to a tree and refused officers' orders to stand and disperse did not actively resist. 276 F.3d at 1130. And in *Bryan*, the arrestee refused an officer's command to get back in his vehicle, shouted gibberish, and began hitting himself in the quadriceps before the officer used a taser to subdue him. 630 F.3d at 830. The Ninth Circuit

---

[2] Defendants do not claim that Strawn posed a threat to the officers' safety. *See* MSJ at 7–8, 12–13.

14

explained that, even when "viewed in the light most favorable to the officer," the arrestee's behavior may not have been purely passive, but "it is a far cry from actively struggling with an officer attempting to restrain or arrest an individual." *Id.* Strawn's conduct prior to her arrest is closer to *Humboldt II*, and the Court concludes that she engaged in passive resistance.

In sum, Strawn committed a minor infraction and passively resisted by refusing to follow the officers' commands. The governmental interest in using force was therefore minimal, but there was nonetheless *some* interest given Strawn's non-compliance with the officers' lawful orders.

### iii. Balancing

"The factors that justify the use of force must be weighed against the degree of intrusion posed by the particular type of force to determine if the use in the particular instance was reasonable." *Nelson*, 685 F.3d at 883. Under the circumstances, the need for force was low, as was the level of force the officers used. Officers Sokoloff and Anaya handcuffed Strawn and obliged her request to check the handcuffs when she said they were too tight, by placing a finger in between the cuff and her wrist to ensure there was sufficient room. Thereafter, Strawn did not complain of the handcuffs being too tight, and she had only small bruises on her wrists and did not require medical attention.

The force employed was no more than what was needed to perform the arrest. As the Ninth Circuit has advised that both the commission of a misdemeanor, *see Nelson*, 685 F.3d at 880, and passive resistance justify the use of minimal force, *see Bryan*, 630 F.3d at 830, the Court concludes that Sokoloff's and Anaya's use of force was reasonable under the circumstances. The officers did not violate Strawn's Fourth Amendment rights, so they are entitled to summary judgment on this claim.[3]

### c. *Monell* Liability

The City moves for summary judgment on Strawn's claim against it for municipal liability

---

[3] Given this finding that the officers did not use excessive force and did not violate Strawn's Fourth Amendment rights, whether the right was clearly established at the time of the incident need not be addressed. *See Felarca*, 891 F.3d 809, 816 ("A plaintiff must prove both steps of the [qualified immunity analysis] to establish the officials are not entitled to immunity.").

pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). MSJ at 11–12. This claim can be swiftly dealt with because, for Strawn to prevail, she must first "establish[] a deprivation of a constitutional right," and then "must establish that the city was the 'person' who cause[d] [her] to be subjected to the deprivation." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 817 (1985) (quotations omitted). Although Strawn asserts multiple theories of municipal liability, Opp'n at 9–12, each requires the prerequisite of a constitutional violation by an official or employee of the City. *See, e.g.*, *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992). As Strawn has failed to establish that she suffered a violation of any constitutional right, the City is entitled to summary judgment on this claim.

### d. Remaining State Law Claims

Strawn's remaining state law claims for (i) "assault, battery, . . . [and] intentional infliction of emotional distress," and (ii) "gross negligence or willful and wanton misconduct" are likewise foreclosed by the conclusions above that the officers had probable cause to arrest her and utilized an objectively reasonable amount of force in conducting the arrest. Each is discussed in turn.

First, a "prima facie case for battery [against an officer] is not established under California law unless the plaintiff proves that [the] officer used unreasonable force against him to make a lawful arrest or detention." *Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (Cal. Ct. App. 1998)); *see Arpin*, 261 F.3d at 922. As explained above, the officers did not use unreasonable force, so this claim fails. Strawn's assault claim fails for the same reason.

Next, under California law, a claim for "intentional infliction of emotional distress consist[s] of: (1) extreme and outrageous conduct by the defendant with the intent to cause, or reckless disregard for the probability of causing, emotional distress; (2) suffering of severe or extreme emotional distress by the plaintiff; and (3) the plaintiff's emotional distress is actually and proximately the result of defendant's outrageous conduct." *Chang v. Lederman,* 90 Cal. Rptr. 3d 758, 774 (Cal. 2009) (quotations omitted). Strawn's IIED claim against the officers fails at the first prong. "Extreme and outrageous conduct is conduct that is so extreme as to exceed all

1  bounds of that usually tolerated in a civilized community." *Id.* The Ninth Circuit has explained
2  on several occasions that an officer's "behavior [cannot] be outrageous [if] he acted in an
3  objectively reasonable manner" while conducting an arrest. *E.g.*, *Long v. City & Cnty. of*
4  *Honolulu*, 511 F.3d 901 (9th Cir. 2007).

5  Given that Strawn's claim is based entirely on her argument that the officers arrested her
6  without lawful authority and utilized excessive force, *see* FAC ¶¶ 34–43; Opp'n at 12–13,
7  Sokoloff and Anaya are also entitled to summary judgment on this claim.

8  Finally, the Court turns to Strawn's claim for gross negligence or willful or wanton
9  misconduct, which unlike the other state law claims, is asserted against all defendants. FAC
10 ¶¶ 44–47. Gross negligence has "long [] been defined in California and other jurisdictions as
11 either a want of even scant care or an extreme departure from the ordinary standard of conduct."
12 *Joshi v. Fitness Int'l*, 80 Cal. Rptr. 3d 572, 583 (Cal. Ct. App. 2022) (quotations omitted). It is a
13 "subspecies of negligence," rather than a "separate tort." *Id.* Similarly, wanton misconduct is "an
14 aggravated form of negligence, differing in quality rather than degree from ordinary lack of care."
15 *Berkley v. Dowds*, 61 Cal. Rptr. 3d 304, 310–11 (Cal. Ct. App. 2007).

16 As both gross negligence and wanton misconduct are different forms of negligence,
17 Strawn's claim is foreclosed by the conclusions above that the officers had probable cause to
18 arrest Strawn and used an objectively reasonable amount of force in doing so. "In the context of
19 an arrest, if probable cause exists, there can be no claim for negligence [for an officer's decision
20 to make] that arrest." *Collins v. Cnty. of San Diego*, 275 Cal. Rptr. 3d 290, 301 (Cal. Ct. App.
21 2021). Additionally, a negligence claim based on an officer's use of force fails if the use of force
22 was objectively reasonable. *See Luchtel v. Hagemann*, 623 F.3d 975, 984 (9th Cir. 2010);
23 *Warren v. Marcus*, 78 F. Supp. 3d 1228 (N.D. Cal. 2015); *see also Hernandez v. City of Pomona*,
24 94 Cal. Rptr. 3d 1, 12 (Cal. 2009) (holding that prior ruling on Fourth Amendment excessive
25 force claim precludes separate claim for negligence because both require consideration of
26 whether arrest was reasonable under totality of circumstances). As Strawn cannot make out even
27 an ordinary negligence claim, defendants are entitled to summary judgment on her claim for gross
28

negligence or willful and wanton misconduct.

**IV.    Conclusion and Order**

For the reasons explained above:

1. Defendants' motion for summary judgment, Docs. 45, 46, is **GRANTED**;

2. The Clerk of Court is directed to enter judgment for defendants Bruce Sokoloff, J. Anaya, and City of Porterville; and

3. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

Dated:    January 2, 2025

UNITED STATES DISTRICT JUDGE